**In re William O. DAVENPORT, Jr., Debtor.**

**UNIVERSITY STATE BANK, Plaintiff,**

**v.**

**William O. DAVENPORT, Defendant.**

**Bankruptcy No. 82–658.**
**Adv. No. 83–179.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Oct. 13, 1983.

See also, 34 B.R. 460; 29 B.R. 137.

Francis H. Cobb, Shackleford, Farrior, Stallings & Evans, Tampa, Fla., for debtor.

William Knight Zewadski, Trenam, Simmons, Kemker, Scharf, Barkin, Fryes & O'Neill, P.A., Tampa, Fla., for plaintiff.

FINAL JUDGMENT ON COMPLAINT
TO LIFT STAY

ALEXANDER L. PASKAY, Chief Judge.

This is a Chapter 11 reorganization case and the matter presently under consideration is whether or not to lift the automatic stay, permitting the Plaintiff, University State Bank (Bank), to foreclose its interest on three condominiums and 420,000 shares of Key Energy stock which were pledged by William O. Davenport, Jr., the Debtor in

the above-styled Chapter 11 case, to secure obligations owned by the Debtor and Mr. and Mrs. Horace Langshaw. The Langshaws are friends of the Debtor but are not debtors involved in this case or, as far as it appears, in any other case pending under the Bankruptcy Code.

The Complaint filed by the Debtor on February 18, 1983 seeks a relief from the automatic stay. In due course, a preliminary hearing was scheduled and was held on March 14, 1983. At the conclusion of the preliminary hearing, this Court entered an order and extended the automatic stay until the Final Evidentiary Hearing, which at that time was scheduled to be held on April 7, 1983. However, two days before the scheduled hearing, counsel for the parties represented to the Court that they were nearing a settlement agreement and asked that the Final Evidentiary Hearing be removed from the court calendar. However, the parties were not able to amicably resolve all of their differences until June 27, 1983. Accordingly, the Debtor did not file the Stipulation for Settlement and his Application for the Approval of the Settlement until June 27, 1983.

A hearing was scheduled for July 22 to consider the Application to Approve the Settlement Agreement. Inasmuch as it became apparent, at once, that because the Application to Approve Stipulation for Settlement was filed in the adversary proceeding rather than in the general case, notice was not sent to all creditors. For this reason, the hearing had to be reset and was rescheduled for August 13 with notice to all creditors of the proposed Stipulation for Settlement.

After a lengthy hearing to consider the Application to Approve the Stipulation for Settlement, this Court entered an Order and disapproved the settlement as it was structured on the ground that, in the opinion of the Court, it was not in the best interest of the estate to approve the settlement. Inasmuch as the settlement was not approved, it became obvious and apparent that the matter had to be resolved by concluding the pending adversary proceeding.

For this reason, the Court promptly scheduled a Final Evidentiary Hearing for September 13, 1983. It appeared at this point that the matter could be finally settled at the duly scheduled and noticed Final Evidentiary Hearing set for September 13, 1983, when four days before the scheduled Final Evidentiary Hearing, the Bank filed a Motion for Summary Judgment. Since there was not sufficient time as required by FRCP 56, as adopted by the then prevailing Interim Rule 7056, to consider the Motion for Summary Judgment, the scheduled Final Evidentiary Hearing on the Complaint to Lift the Automatic Stay proceeded, as scheduled, without giving an opportunity to the Bank to argue its Motion for Summary Judgment.

The Bank originally sought relief from the automatic stay, pursuant to 11 U.S.C. § 362(d)(1) alleging that the Debtor failed to provide adequate protection of the Bank's interest in the real properties and in the Key Energy stock. However, at the final evidentiary hearing, the Bank, by ore tenus motion, amended its Complaint to conform with the evidence and also sought relief pursuant to § 362(d)(2) as to the Key Energy stock, contending that the Debtor has no equity in the subject stock and that the stock is not needed for an effective Chapter 11 reorganization.

The Debtor, in his Answer, asserted numerous affirmative defenses, including fraud in the inducement, misrepresentation, usury, lack of consideration and allegations that the transfers to the Plaintiff constituted preferential transfers under 11 U.S.C. § 547 and fraudulent transfers under § 548. Therefore, according to the Debtor, the security interest claimed by the Bank is invalid and unenforceable against the Debtor; *§ 1107 of the Bankruptcy Code.*

The facts which are relevant and germane to the resolution of the matters under consideration may be summarized as follows:

On December 19, 1980 the Debtor executed a promissory note in favor of the Bank in the amount of $500,000 and pledged as security 100,000 shares of stock

in Key Energy Enterprises. Subsequent to this original transaction, the Bank sought additional collateral from the Debtor and as additional security, the Debtor pledged another 100,000 shares of Key Energy stock to secure the indebtedness represented by the note executed by the Debtor on December 19, 1980. In addition, the Debtor also executed three mortgages in favor of the Bank on three condominiums owned by him located in Escambia County, Tampa and Redington Shores, Florida, respectively. The Tampa condominium is located on Mariner Drive and it is the Debtor's principal residence. There is some evidence which indicates that the Debtor may have granted the three mortgages in favor of the Bank, not for the primary purpose of securing the pre-existing $500,000 obligation, but for the purpose of preventing Metropolitan Bank from proceeding against those properties to collect on a $4.2 million obligation owed by the Debtor to Metropolitan Bank. The Debtor, who was at that time closely connected with the Bank, agreed that the three mortgages granted on these properties were granted only to be used as a device against Metropolitan Bank to prevent the enforcement of its claim against these properties.

It further appears that the Debtor permitted Horace and Shirley Langshaw, his personal friends, to pledge additional shares of the Debtor's Key Energy stock to secure four of their notes, executed by them in favor of the Bank on April 13, 1981; April 29, 1981; June 3, 1981; and October 22, 1981 respectively. Although the Debtor permitted the Langshaws to pledge as security, Key Energy stock, it is clear that the Debtor was not a co-maker or guarantor of the Langshaw's notes. While the Debtor did not receive any of the proceeds of the Langshaw's loan, there is evidence that the pledge of the Debtor's stock facilitated the Langshaw loan and placed the Langshaws in a position of being able to repay an outstanding debt owed by them to the Debtor.

In April of 1981 the Debtor became a shareholder in the Bank with holdings representing approximately 15% of the outstanding shares. From that time until his resignation, on October 20, 1981 (Defendant's Exhibit No. 2), the Debtor was a member of the Bank's Board of Directors. During that time he also was a Vice-President of the Bank and there is evidence indicating that he continued to hold that office after resigning from the Board of Directors. The parties have stipulated to the fact that the Debtor was a Vice-President of the Bank, but have not stipulated to the relevant time periods. According to the deposition of Richard Churchill, Vice-President in charge of the Loan Department at the Bank during the time relevant to this controversy, and also Chairman of the Board of Directors, it is possible that the Debtor retained his position as Vice-President of the Bank until some time in 1982 (Defendant's Exhibit No. 4, page 33, line 7).

The Debtor resigned his position as a Director of the Bank on October 20, 1981 (Defendant's Exhibit No. 2), shortly before he executed the three mortgages in favor of the Bank on October 29, 1981 and on November 3, 1981, although he did not resign from his position as Vice-President at that time. During this time, he routinely provided the Bank with financial statements and it is therefore likely that the Bank was aware of the Debtor's financial plight at the time it received additional collateral by way of mortgages and stock pledges and that the Debtor was an "insider" during this time.

Applying the relevant law to the facts present in this controversy, it appears that it is not unlikely that the Debtor may be able to prevail in an action to avoid and set aside the pledge of the additional shares and the grant of the mortgages, as preferential transfers of Key Energy stock under § 547(b) which provides as follows:

§ 547. *Preferences*

(a) * * *

(b) Except as provided in subsection (c) of this section the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The first 100,000 shares were pledged as collateral contemporaneously with the receipt of $500,000 and, therefore, it would not be subject to avoidance through a § 547 preferential action because of the qualifying language of § 547(c)(1) which states:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

■ Counterclaims and affirmative defenses concerning collateral and unrelated matters normally may not be considered within the context of a complaint or motion for relief from the automatic stay, inasmuch as relief from the automatic stay is not a claim to which a counterclaim can be asserted. *In re Essex Properties, Ltd.,* 430 F.Supp. 1112 (N.D.Cal.1977). However, when the affirmative defense contests the validity of the lien at issue, such affirmative defense should be considered in determining whether or not the automatic stay should be lifted or extended. *United Companies Financial Corporation v. Brantley,* 6 B.R. 178, 188 (Bkrtcy.N.D.Fla.1980).

■ In the proceeding presently under consideration, not only do the affirmative defenses of preferential and fraudulent transfer under §§ 547 and 548 of the Bankruptcy Code contest the validity of the subject liens, but these are actions which may be maintained only in the bankruptcy forum and could not be raised as affirmative defenses in a state court. Thus, if the stay is lifted and the Bank is permitted to foreclose its interest in the properties, the Debtor would be deprived of these defenses. For this reason, this Court is of the opinion that the automatic stay should be extended to allow the Debtor to assert his claim of preferential transfer under § 547 and fraudulent transfer under § 548 as to the three mortgages and as to the 320,000 of the 420,000 shares of Key Energy stock.

This leaves for consideration the issue of adequate protection during the extension of the automatic stay.

■ The evidence presented at the Final Evidentiary Hearing indicates that the Redington Shores condominium has a value of $400,000 and the Mariner Drive condominium has a value of $275,000 (Pl's Exh. No. 5 and No. 6). No evidence was presented as to the value of the Escambia condominium except for an inhouse appraisal by the Bank personnel, which is not relevant to valuation for the purposes of providing adequate protection. (Defendant's Exh. No. 1).

The Redington Shores condominium is encumbered by a first mortgage in favor of Home Federal Savings and Loan Association of St. Petersburg in the amount of $91,296.17 as of the date of the Final Evidentiary Hearing. The Debtor, therefore, has substantial equity in the Redington

Shores condominium in the amount of $309,803.83.

The Mariner Drive condominium is encumbered by a first mortgage in favor of Freedom Mortgage Company of Tampa in the amount of $44,559.36. The Debtor, therefore, also has substantial equity in this property in the amount of $230,441.64 (Pl's Exh. No. 13). No evidence was presented as to whether or not the Escambia County condominium is encumbered by a mortgage. This Court is satisfied that the equity cushion in the Mariner Drive and Redington Shores condominiums is sufficient to furnish temporary adequate protection.

In light of the fact that the validity, vel non, of the security interest claimed by the Bank in 320,000 shares of Key Energy stock pledged to secure the Langshaw loan is yet to be determined, the Debtor shall not be required to furnish adequate protection.

In light of the foregoing, it is

ORDERED, ADJUDGED AND DECREED that the relief sought in Complaint to Lift the Automatic Stay be granted, in part, and denied in part.

It is further

ORDERED, ADJUDGED AND DECREED that the automatic stay be lifted in favor of the Bank for the purpose of liquidating the 100,000 shares of Key Energy stock pledged as security for the $500,000 promissory note entered into on December 19, 1980.

It is further

ORDERED, ADJUDGED AND DECREED that the automatic stay shall continue in full force and effect as to the remaining 320,000 shares of Key Energy stock and as to the three condominiums which were pledged as additional security or pledged as security for the debt of Horace and Shirley Langshaw.

It is further

ORDERED, ADJUDGED AND DECREED that the Debtor shall initiate appropriate action seeking to avoid the transfers of the three mortgages and the 320,000

shares of Key Energy stock within 30 days from the date of entry of this order.