**In re The MOORE & WHITE CO., INC. Debtor.**

**Bankruptcy No. 87–05625F.**

United States Bankruptcy Court, E.D. Pennsylvania.

Feb. 26, 1988.

As Amended March 2, 1988.

278

Jami Wintz McKeon, Morgan, Lewis & Bockius, Philadelphia, Pa., David E. Schaper, Keck, Mahin & Cate, Chicago, Ill., for movant, Loyola Paper Co.

Paul B. Maschmeyer, Lashner, Victor & Maschmeyer, Philadelphia, Pa., for debtor, Moore & White Co., Inc.

Gary D. Bressler, Mitchell Klein, Adelman Lavine Gold & Levin, Philadelphia, Pa., for Unsecured Creditors' Committee.

James J. O'Connell, U.S. Customs House, Philadelphia, Pa., Asst. U.S. Trustee.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge.

Loyola Paper Company, (Loyola), has filed a motion for relief from the automatic stay alleging that the debtor currently possesses a paper cutting machine belonging to Loyola and requesting that this court order the debtor to turnover the property. Both the debtor and the official committee of unsecured creditors oppose this motion. They argue that the debtor has possession of the machine pursuant to an executory contract and is entitled to retain possession until that executory contract is rejected in accordance with 11 U.S.C. § 365(a).

### I.

After hearing testimony on the matter, I make the following factual findings:

1. On May 30, 1986, the debtor and Loyola entered into a written agreement by which the debtor agreed to construct and Loyola agreed to purchase a PRD Double Rotary Knife Sheeting System for a total purchase price of $675,000.00.

2. This agreement, admitted in evidence as L–1, set forth the following payment terms:

| | |
|---|---|
| $168,500.00 | Down Payment |
| 150,000.00 | Mid Term |
| 53,500.00 | Upon Shipment |
| 65,000.00 | 30 Days after Installation |
| 238,000.00 | Payable monthly over a three year term at 5% interest according to the attached note payable document and payment schedule. |
| $675,000.00 | TOTAL |

3. On or about the time the agreement was reached, Loyola paid $168,500.00 to the debtor, representing the down payment.

4. The agreement called for the machine to be completed and shipped to Loyola within 22 to 25 weeks. (L–1, at 30). However, on January 30, 1987, the debtor wrote to Loyola explaining that completion of the machine had been delayed. Completion was estimated for early May, 1987 and delivery, after testing, would be made by mid-May, 1987. (L–2).

5. After receiving the letter, Loyola then paid $150,000.00 to the debtor which represented the requisite mid-term payment and which was requested by the debtor in its letter.

6. By June, 1987, the machine was still not fully constructed. In a letter dated June 23, 1987, (L–7), the debtor proposed an amendment to the contract of May 30, 1986. Under this proposal, the payment timetable was to be altered. Instead of next paying the debtor upon shipment of the completed machine, the debtor requested that Loyola pay the balance due on the original contract, $356,500.00, as follows:

Payment terms for the machine will be revised as follows:

| | |
|---|---|
| Due now | $100,000.00 |
| Due as expended by Moore & White on Loyola materials and labor, up to | $150,000.00 |
| Due upon factory acceptance test, up to | $ 72,750.00 |
| Due thirty (30) days after installation | $ 33,750.00 |
| Total | $356,500.00 |

7. While the debtor testified, through its chief executive officer, that Loyola orally agreed to this revised payment schedule, Loyola, through its vice-president, testified otherwise.

8. The evidence supports Loyola's position that it rejected debtor's request to modify the May, 1986 contract. At no time did Loyola make any payments pursuant to the revised schedule; indeed, the debtor did not offer any evidence that such payments were demanded. Furthermore, on July 16, 1987, the parties signed a bill of sale.

9. The bill of sale, dated July 16, 1987 and admitted into evidence as L–3, states that the debtor, upon signing, transfers title to the partially completed machine to Loyola and gives Loyola a right to immediate possession. In return, Loyola is obligated to pay $54,816.01 to Meridian Bank on the debtor's behalf. The bill of sale has attached the May 30, 1986 agreement, (L–1), but neither mentions nor attaches the June 23, 1987 letter, (L–7).

10. Shortly after signing the agreement, Loyola paid $54,816.01 to Meridian Bank.

11. Although the debtor argues that it is implausible to conclude that it would transfer ownership and possession of the machine to Loyola (and release it from the obligation imposed by the $238,000.00 note, *see* finding # 2) in return for total payments of $373,316.01 ($168,500.00 + $150,-000.00 + $54,816.01), this argument assumes that the value of the machine, as of July 16, 1987 far exceeded $373,316.01.[1] The debtor offered no evidence as to the value of the machine, which was unfinished and uninstalled as of the date of the bill of sale.

12. Although Loyola had the right to take possession of the machine, as of July 16, 1987, it left the machine at the debtor's premises through the date of the debtor's bankruptcy filing. The machine was clearly marked as the property of Loyola while in the debtor's possession; however, Loyola never demanded possession from the debtor until after the instant bankruptcy case was commenced.

13. Loyola maintains that it left the machine in debtor's possession because: its vice-president was vacationing after July 16, 1987; it is a heavy machine to transport; and, it was searching for another company able and willing to complete construction. These explanations do not fully justify leaving the machine in the debtor's possession for many months.

14. After July 16, 1987, the debtor sent Loyola a list of parts needed to complete construction of the machine. Initially these parts were estimated to cost approximately $160,000.00. Subsequently, the list was amended to reflect total cost of roughly $186,000.00. Some additional labor expenses were estimated at approximately $22,000.00.

15. After July 16, 1987, Loyola arranged for some of those parts to be shipped from suppliers to the debtor. Not all necessary parts were either ordered or shipped. Loyola paid for these parts directly by payments to the suppliers.

16. In September 1987, the debtor provided Loyola with a status report concerning the machine in question. This report estimated that the machine could be fully assembled, tested and shipped to Loyola by December 4, 1987. This estimate was not met. However, upon receipt of this status report, Loyola never stated that the debtor should cease all work on the machine.

17. The debtor's staff has been reduced from thirty-two employees prepetition to six employees postpetition. Were the debtor to complete the machine, it would need to hire additional employees or subcontract some necessary work.

---

1. The debtor estimated on June 23, 1987 that installation would cost approximately $54,- 200.00. (L–7). This cost was to be borne by the debtor, not Loyola.

18. Were the debtor to complete the machine, total payments received would be less than the total cost to the debtor of designing, building, testing and installing the machine. (*See* L–7).

19. The debtor believes that its losses would be reduced if it were to complete the machine rather than stop at this point in construction. The evidence was unclear how much of a loss reduction, if any, would occur. $301,683.49 of the original purchase price remains unpaid. At one point in its testimony, the debtor testified that $75,000.00 in parts, $75,000.00 in labor and "possible [sic] some working capital support" were needed. (N.T. January 14, 1988 at 57). However, the debtor also testified that at least $120,000.00 in parts would be needed to complete the machine. (N.T. at 58). Moreover, it is uncertain whether the $22,000.00 labor costs for electrical and mechanical labor was included in the labor estimate of $75,000.00. In addition, the debtor's estimate does not reflect installation costs of $55,000.00.

20. The debtor is unable to complete construction of the machine without Loyola's compliance with the funding schedule, (including the immediate $100,000.00 payment), set out in debtor's request of June 23, 1987. (N.T., at 54, 55).

21. Loyola expected that the debtor would receive parts and perform some work on the machine after the bill of sale was signed. The method of compensation was not agreed upon. (N.T. at 37, 45–46).

22. The debtor filed a voluntary bankruptcy petition under chapter 11 on November 11, 1987.

## II.

I make the following legal conclusions:

1. As of the commencement of this chapter 11 case, the movant had title to the PRD Double Rotary Knife Sheeting system. The debtor had mere possession.

2. No executory contract existed between the debtor and movant as of the commencement of the case and the debtor had no rights under 11 U.S.C. § 365.

3. The movant is entitled to relief from the stay for cause, 11 U.S.C. § 362(d)(1), and pursuant to §§ 362(d)(2) as the debtor had no equity in the machine and continued possession is not needed for an effective reorganization.

4. Respondents have not shown a reasonable likelihood that the sale of the machine to movant could be set aside under 11 U.S.C. § 548(a)(2).

5. The debtor waived any possessory lien it may have had by the express terms of the July 1987 bill of sale.

6. Movant is not entitled to an order requiring turnover, as 11 U.S.C. § 542 is a substantive right possessed by the trustee or debtor-in-possession, not a creditor.

## III.

This contested matter is a little unusual for, at bottom, the movant wishes to recover possession of a machine to which it took title and the right to possession in July, 1987 and then left in the debtor's possession. Not to be outdone, the debtor and creditors' committee oppose this motion for they desire to complete construction of a machine which will be more expensive to construct and install than its purchase price. As will be noted below, plausible explanations are offered for these awkward positions. Moreover, however odd the parties' respective desires, the legal analysis to resolve this dispute is straightforward.

■ There can be no real dispute that the debtor transferred title to the partially completed machine in July, 1987, which was four months prior to the debtor's bankruptcy filing. Unless the transfer were set aside [2] the debtor's estate does not include this machine. See *In re Schauer*, 62 B.R. 526, 529–530 (Bankr.D.Minn.1986); *In re Rouse*, 48 B.R. 236, 240 (Bankr.E.D.Pa. 1985); *In re Cherry*, 37 B.R. 893 (Bankr.E. D.Pa.1984). Thus, the provisions of the automatic stay to the extent they are designed to protect property of the estate,

---

2. The creditors committee's argument under 11    U.S.C. § 548 will be discussed *infra*.

are inapplicable.[3] *In re Cherry.* However, 11 U.S.C. § 362(a)(3) also protects property in the possession of the debtor:

> (a) ... a petition filed ... operates as a stay ... of ...
>
>> (3) any act to obtain possession of property of the estate *or of property from the estate....*

Therefore, "a mere possessory interest in real property, without any accompanying legal interest, is sufficient to trigger the protection of the automatic stay." *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427, 430 (2nd Cir.1987). The same principle applies to personal property. *E.g., In re W.L. Bradley Co., Inc.*, 75 B.R. 505, 513 (Bankr. E.D.Pa.1987) (PACA trust funds). As a result, Loyola must obtain relief from the automatic stay in order to recover possession of its machine.

11 U.S.C. § 362(d) sets forth two discrete, independent bases upon which Loyola may seek relief. As the debtor does not own the machine in its possession, Loyola, arguably, should be granted relief for "cause", pursuant to § 362(d)(1) unless the debtor demonstrates some need for retaining possession of the machine and adequately protects Loyola's interests.[4] *See In re Phillips*, 40 B.R. 194 (Bankr.D.Colo. 1984); *In re Marta Group, Inc.*, 33 B.R. 634 (Bankr.E.D.Pa.1983). *See also In re STN Enterprises, Inc.*, 44 B.R. 512 (Bankr. D.Vt.1984); *Citizens National Bank v. Harold Munce Toyota, Inc*, 37 B.R. 928, 930 (N.D.Tex.1983). Loyola should also be granted relief, as the debtor has no title to and so no equity in the machine, unless retention of mere possession (i.e. use of the property), is "necessary to an effective reorganization." § 362(d)(2); *accord e.g. In re Air Vermont, Inc.*, 44 B.R. 440, 446 (Bankr.D.Vt.1984).

As I understand respondent's position, they do not contend that possession of the machine, by itself, has value to the estate.[5] In fact, the debtor's ultimate goal is to relinquish possession. Instead, respondents argue that continued possession of the machine is important to the debtor so that it may complete its construction and earn additional sums by so doing. As these funds are needed by the debtor to reorganize, and as the value of the machine will increase upon its completion, the respondents maintain that its burden under § 362(g)(2) is met and relief under § 362(d)(1), and (d)(2) should be denied.

Accepting the logic of this position in the abstract, I note that the debtor concedes that it does not have the financial ability to complete construction without the infusion of capital from Loyola under the terms outlined in its proposal of June 23, 1987. (N.T. at 54). Therefore, respondents opposition to this motion is premised, at bottom, upon their contention that Loyola has a duty to supply those needed funds.[6] And they derive this duty by arguing that the terms set forth in the letter of June 23, 1987 were accepted by Loyola and represent an executory contract which the debtor intends to assume pursuant to 11 U.S.C. § 365(b). Moreover, if an executory contract exists between the debtor and Loyola, respondents believe that Loyola is limited solely to seeking to compel the debtor to assume or reject this contract, *see* 11 U.S. C. §§ 365, 1123(b)(2), rather than seeking relief from the stay. *In re Sweetwater*, 40 B.R. 733 (Bankr.D.Utah 1984). *But see In re DeSantis*, 66 B.R. 998 (Bankr.E.D.Pa. 1986) (lessor can utilize § 362(d)).

---

**3.** This is not to say that a debtor may not have an interest in property distinct from title which constitutes property of the estate. In the matter *sub judice*, though, the only interest alleged by the debtor is the existence of an executory contract. That matter will be dealt with *infra*.

**4.** Because respondents premise their opposition to this motion on the existence of a contractual obligation, I need not consider whether relief from the stay must be granted against a debtor who has no nonbankruptcy right to possession.

**5.** It would have value insofar as the debtor may hold a possessory lien. This issue also will be discussed *infra*.

**6.** Under the facts as presented, I do not pass upon whether Loyola's motion for relief must fail if the debtor presented evidence that it could obtain financing elsewhere. Nor do I decide whether the willingness of the debtor to complete construction constitutes "adequate assurance" as required by § 365(b).

In order to resolve this dispute, I need not decide whether Loyola may only protect its interests by requiring the debtor to assume or reject, under § 365, or whether it can utilize § 362(d). Such an analysis would be necessary only if I were to find that an executory contract existed at the time this case commenced. Under the facts as presented, I cannot make such a finding.

The term "executory contract" is not defined in the Bankruptcy Code. As a result, there is some dispute over the meaning of the term, *see generally Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043 (4th Cir.1985), *cert. denied* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *In re Norquist*, 43 B.R. 224 (Bankr.E.D.Wash.1984), with most courts accepting the definition offered by Professor Countryman. *See* Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973). This definitional quandary, though, centers upon the issue of what is executory, not what is a contract. Whether a contract was created is one of the more settled issues of common law; the notion that a contract may be modified if mutually agreed upon is hardly controversial. *E.g. Barnhart v. Dollar Rent A Car Systems, Inc*, 595 F.2d 914 (3rd Cir.1979); 13 Pa. C.S.A. § 2209 (U.C.C. § 2–209).

There is no disagreement that the debtor and Loyola entered into a contract by virtue of their agreement on May 30, 1986. In sum, this agreement called for the debtor to sell a machine to Loyola for a price to be paid pursuant to a particular schedule. Due to financial constraints the debtor was unable to fulfill its contractual obligation and needed funds to complete the project. It proposed, by letter dated June 23, 1987, that Loyola agree to modify the payment terms so that, *inter alia*, Loyola would pay $100,000.00 immediately to the debtor. While the debtor's officer testified that its proposal was "favorably received", (N.T. at 51), this testimony, to the extent it connotes that Loyola agreed to the proposed modification of the contract, is simply not credible in light of the subsequent conduct of the parties.

It is undisputed that Loyola never forwarded an additional $100,000.00 to the debtor. In fact there is no evidence that the debtor ever requested these funds. Instead, the debtor entered into an agreement in July 1987, (the bill of sale), by which it sold its interest in the machine to Loyola for an additional sum, approximately $55,000.00, which was then paid by Loyola to a bank on the debtor's behalf. The June proposal never mentions this $55,000.00 payment and the July agreement does not refer to the June proposal. Only the May, 1986 agreement is mentioned in the bill of sale. It is quite clear from the parties' July agreement that Loyola never accepted the debtor's June proposal.[7] Therefore, I cannot conclude that a contract exists, be it executory or not, on the terms as proposed by the debtor in June 1987.[8]

The debtor urges me to focus upon the post July, 1987 conduct of Loyola because it both left the machine in the debtor's possession and sent, via suppliers, parts to the debtor needed for additional work on

---

**7.** Because I find that there was no assent by Loyola to the June proposal, I need not reach the question of whether the parol evidence rule is applicable to this case. *See generally, FR. Winkler v. Stoller*, 839 F.2d 1002 (3rd Cir.1988); *In re Dinkins*, 79 B.R. 253 (Bankr.E.D.Pa.1987).

**8.** This result obviates the need to pass upon such issues as whether 11 U.S.C. § 365(c)(2), which prevents a debtor in possession from assuming an executory contract which is a contract "to make a loan, or extend other debt financing, ..." applies to this agreement. The purpose of this provision is to prevent the trust-

ee from "demand[ing] new loans or additional transfers of property under lease commitments" H.Rep. No. 95–595, 95th Cong. 1st Sess. 348 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6304. Whether the instant matter is a disputed loan agreement or sale of goods agreement I leave open. *See generally In re United Press International, Inc.*, 55 B.R. 63 (Bankr.D.D.C.1985). I do note that if Loyola's position is accurate, then theoretically the signed agreement of May 1986 might also have been nonassumable. *Contra, Matter of Wills Travel Service, Inc.*, 72 B.R. 380, 386 (Bankr.M.D.Fla.1987); *In re United Press International, Inc.*

the machine. I agree that such conduct reflects an intent by Loyola to have the debtor continue to do work in constructing the machine; but, this work was not to be paid pursuant to the debtor's June, 1987 proposal. Instead, I conclude that Loyola intended to pay for work after or while it was performed, rather than in advance as the debtor desired, with the terms of payment not yet agreed upon. Indeed, it does seem that Loyola was not foreclosing the possibility that it might enter into a new agreement with the debtor regarding completion of the machine, especially if it was unable to find anyone else willing and able to finish construction. However, Loyola had not entered into this new agreement by the time the debtor commenced this bankruptcy proceeding.

In short, I will not compel Loyola to agree to terms which it rejected prepetition and which the debtor never sought to enforce. Thus, I conclude that the terms of the June, 1987 proposal do not constitute an executory contract. The May, 1986 agreement was terminated, *inter alia*, by the July 1987 agreement. As a result, there is no executory contract for the debtor to assume. *See In re Triangle Laboratories, Inc.*, 663 F.2d 463 (3d Cir.1981); *In re Mushroom Transportation Co.*, 78 B.R. 754, 760 (Bankr.E.D.Pa.1987).

### IV.

By concluding that the debtor cannot compel Loyola to provide it needed capital to complete construction of the machine, I am rejecting the respondent's principal line of defense to this motion. Lack of funds in this instance means an inability to complete construction, thus making the debtor's possession of the machine of no benefit to its estate or to Loyola.[9] However, respondent's able counsel assert two alternative grounds for denying this motion for relief. First, they assert that the July 1987 transfer of title may be set aside as a fraudulent conveyance pursuant to 11 U.S.C. § 548; in addition, they argue that the debtor holds a possessory lien to secure payment for work done to complete the machine, after the machine was sold to Loyola.

### A.

Courts in this and other jurisdictions have permitted parties in interest to defend motions for relief on the basis that a transfer can and would be avoided. *See In re Dennison*, 50 B.R. 950 (Bankr.E.D.Pa. 1985); *In re Davenport*, 34 B.R. 463 (Bankr.M.D.Fla.1983). *See also In re Paolino*, 72 B.R. 555 (Bankr.E.D.Pa.1987). As recognized in *Paolino* " '[c]onsideration' of such defenses and counterclaims may require the court to hear sufficient evidence to enable it to make a preliminary determination whether the party opposing relief is likely to prevail on the claim or defense." 72 B.R. at 558. *See In re Dennison*, 50 B.R. at 955.

In an action based on 11 U.S.C. § 548(a)(2),[10] the party seeking to avoid the transfer has the burden of establishing that the transfer was made for less than reasonably equivalent value. *In re Brunell*, 47 B.R. 830 (Bankr.E.D.Pa.) *aff'd* 76 B.R. 64 (E.D.Pa.1985). Such a showing must be made by a preponderance of the evidence. *In re Metro Shippers*, 78 B.R. 747 (Bankr.E.D.Pa.1987).

Given this burden, a party attempting to use section 548 as a defense to a motion for relief from stay must make a sufficient showing to convince the court that it is likely to prevail on the merits of an action pursuant to section 548. *See Dennison*, 50 B.R. at 955; *Davenport*, 34 B.R. at 465. *Cf. In re Gellert*, 55 B.R. 970 (Bankr.D.N.H.1985) (continuing the automatic stay on the ground of an available defense to the claim requires a showing analogous to the showing necessary for a preliminary injunction including *inter alia* establishing "likelihood of success on the merits".) Although the party need not

---

9. This result obviates the need to address Loyola's position that the debtor, due to its lack of employees, would be unable to complete construction work even if it had the necessary funds.

10. It appears from the committee's brief in opposition to the motion, at 28, that it is relying upon § 548(a)(2).

prove his case under section 548 to prevail on his defense to the motion for relief, he must come forward with sufficient evidence to allow the court to conclude that there is a reasonable probability that he will ultimately prevail in a fraudulent transfer action. *See Paolino.*

■ Here, there was no evidence concerning the value of the machine at the time of transfer, so that I cannot reach any decision concerning the equivalence of the consideration paid by Loyola. 11 U.S.C. § 548(a)(2)(A). Furthermore, there was no evidence offered concerning any of the requirements imposed by § 548(a)(2)(B), such as the insolvency of the debtor at the time the transfer was made. While I do not now hold that a party in interest may not ultimately set aside the July, 1987 transfer as fraudulent, there is no basis for me to conclude that there is a reasonable probability that such an attempt would be successful. Therefore, I cannot deny the motion on this basis. *See In re Liona Corporation, N.V.,* 68 B.R. 761, 765 (Bankr.E.D. Pa.1987).

### B.

■ But for the provisions of the bill of sale, the creditors' committee may be correct that any work done to complete the machine after the July sale would be protected by a possessory mechanics lien. However, the debtor agreed as follows:

4. Seller hereby forever waives and releases, and agrees to defend, hold harmless and indemnify Buyer against, any and all liens or claims under any laws, statutes, or the common law on the Machinery arising from Seller and all persons claiming by, through or under Seller on account of labor or services, material, apparatus or machinery heretofore furnished or which may be furnished at any time hereafter by Seller, or by any person or party claiming any lien by, through or under Seller.

Bill of Sale ¶ 4 (Exhibit L–3).[11]

This is not to say that the debtor would not be entitled to compensation, perhaps under the theory of quantum meruit or unjust enrichment, for work done which increased the value of the machine after the July 1987 sale.[12] *See generally, Belmont Industries, Inc. v. Bechtel Corp,* 425 F.Supp. 524 (E.D.Pa.1976); *Schlecter v. Foltz,* 179 Pa.Super. 119, 115 A.2d 910 (1955). That matter is not now before me. However, it does appear that the debtor waived any possessory lien when it sold the machine to Loyola. Therefore, it will suffer no harm if possession were obtained by Loyola.

### V.

Since possession will not benefit the debtor, I shall exercise my discretion under § 362(d), *see In re Shariyf,* 68 B.R. 604, 606–607 (E.D.Pa.1986), and grant Loyola relief from the automatic stay. In so doing, I will not also order that the debtor turnover the property to Loyola immediately.[13]

■ The effect of granting relief from the stay is to allow a creditor to proceed and assert nonbankruptcy created rights (e.g. state law rights) in a nonbankruptcy forum. The creditor may proceed without regard to the bankruptcy filing. Generally, those rights are not enforced by the bankruptcy court; and a motion for relief, which is to be heard and decided expeditiously, is not designed to short circuit nonbankruptcy substantive and procedural requirements. *See In re Adams,* 65 B.R. 646 (Bankr.E.D.Pa.1986). In certain narrow circumstances, policy considerations dictate that the creditor should obtain immediate possession from a bankruptcy court. *In re W.L. Bradley Co., Inc.,* 75 B.R. at 513–514 (PACA trust was imposed to provide

11. This language supports my earlier conclusion that Loyola contemplated that the debtor might perform work on the machine subsequent to the July 1987 agreement.

12. The debtor, to the extent not waived by the bill of sale, may have other claims (e.g. storage).

The existence of such claims does not defeat Loyola's right to relief.

13. The general turnover statute, 11 U.S.C. § 542(a), refers to property being turned over to the trustee, not from the trustee (or debtor in possession).

prompt payment to sellers).[14] Such policy considerations do not exist here. *See In re Air Vermont, Inc.,* (no turnover ordered). *Contra In re STN Enterprises, Inc.* (turnover ordered).

Therefore, Loyola is now free to assert its replevin rights in the appropriate non-bankruptcy forum. The debtor is also free to assert any claim it may have against Loyola in an appropriate forum.

An order to this effect will be entered.