**In re ALLEGHENY IMAGING INSTITUTE, A Limited Partnership, Debtor.**

**Bankruptcy No. 86–1497. Motion No. 86–3900.**

United States Bankruptcy Court, W.D. Pennsylvania.

Feb. 11, 1987.

Richard A. Pollard, Pittsburgh, Pa., for debtor.

Garland H. McAdoo, Jr., Tucker Arensberg, P.C., Pittsburgh, Pa., for Dr. Armfeld.

James F. Grenen, Kincaid & McGrath, P.C., Pittsburgh, Pa., for Equibank.

Gary L. Smith, Pittsburgh, Pa., trustee.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is Equibank's *Motion For Relief From Stay,* which asserts that Equibank possesses a valid security interest in a sum of $14,500.00. Equibank characterizes this sum as a "contract right" belonging to the Debtor, arising out of a contract by and between the Debtor (also referred to as "AII") and Dr. Samuel L. Armfeld, III; wherein Dr. Armfeld agreed to purchase the assets of the Debtor. The amount of $14,500.00 represents the initial deposit of funds under said contract by Dr. Armfeld.

Equibank asserts that Dr. Armfeld breached this contract, and thereby relinquished his rights in this fund; therefore, Equibank asserts that it possesses the right to said fund, pursuant to its security interest.

Dr. Armfeld has challenged Equibank's Motion, claiming that a valid contract has never materialized as there had been no meeting of the minds; alternatively, Dr. Armfeld claims that if a contract did exist, said contract was not breached. Dr. Armfeld and the Trustee both argue that this fund constitutes a "deposit account" rather than a "contract right", which cannot be the subject of a Uniform Commercial Code ("UCC") security interest; therefore, Equibank's security interest cannot include said deposit.

A hearing was held on this Motion at which time testimony was taken from Dr. Armfeld and Mr. Joel Aronson, the Debtor's business consultant and authorized representative. Thereafter, Equibank and Dr. Armfeld submitted briefs on these issues.

Based upon the testimony offered at trial, the subsequent briefs, and this Court's own research, we find that a contract did exist and it was breached. Further, we find that Equibank was secured in "contract rights", and the proceeds thereof. While there is no question but that the $14,500.00 sum constitutes a deposit account, it is also the proceeds of the contract right. As said deposit account contains only proceeds, it is subject to Equibank's security interest. Since AII remains indebted to Equibank in the amount of $66,991.61, relief from stay will be granted.

## FACTS

The Debtor was a medical center which specialized in radiological examinations and relied, for its continued operation, on patient referrals from a pool of physicians. The Debtor required highly technical and very costly equipment to maintain its practice, as well as appropriately trained staff to utilize this equipment. Equibank provided the Debtor with a loan for $85,000.00 on October 3, 1985. A Security Agreement was executed between AII and Equibank, which included "contract rights" within its rather expansive definition of receivables. Subsequent to the execution, Equibank filed the appropriate UCC financing state-

ments, which indicated that Equibank was also secured in any proceeds resulting from its security interest.

Sometime thereafter, the Debtor began to suffer serious financial difficulties. During that time, it approached Dr. Armfeld to staff the center in return for a percentage of the receivables. While Dr. Armfeld was associated with the Debtor, the number of referrals grew; however, the Debtor's financial situation was in such dire straits that in mid-November of 1985, a management consultant, Mr. Aronson, was hired.

Mr. Aronson advised the Debtor that in order to avoid bankruptcy, the Debtor's partners should sell the business to pay off their creditors. As Dr. Armfeld was already operating the medical portion of the business, he appeared to be the logical choice for buyer.

Negotiations relevant to such a purchase began. Initially these meeting involved Mr. Aronson; Mr. Beisler, the representative of AII's managing partner; Dr. Armfeld; and his financial advisor. Dr. Armfeld notified Mr. Aronson that he had located a group of investors interested in pursuing this asset purchase. These activities culminated in a meeting, wherein Dr. Armfeld and Michael Pitterich, an attorney representing the investor group, met with Mr. Beisler and Mr. Aronson. One of the results of these negotiations was a document, alternately referred to by the parties as the "contract" or the "letter of intent". Another result was a deposit of $14,500.00, by Dr. Armfeld, in a deposit account; said sum represented the deposit called for in the document. Michael Pitterich, Dr. Armfeld, and Joel Aronson signed this document. Dr. Armfeld hesitated in signing the document because of concern over the language found in Paragraph 6, which states:

If Buyer does not close this transaction due to a breach of this Agreement by Buyer, AII shall be entitled to retain as liquidated damages the fifteen thousand ($15,000) 14,500

dollars deposit. However, this shall be the only damages AII shall be entitled to and there shall be no other damages or rights of action against Buyer. Any other monies paid to AII pursuant hereto shall be returned to Buyer.

(Strike-outs and additions in original.)

When Dr. Armfeld voiced his concern over Paragraph 6, indicating that he did not want to lose the money he was depositing, he was advised by Attorney Pitterich that he was protected by the language of Paragraph 7, which states:

The obligations of Buyer hereunder are subject to legal counsel for Buyer and AII agreeing to the final closing documentation that will provide the details of the transaction described herein.

Based upon the explanation he requested and received from an individual trained in the law, Dr. Armfeld testified that he believed he would not be bound by this Agreement, until his attorney had worked with counsel for the other parties on the drafting of final documentation. Dr. Armfeld also testified that because of the time constraints being placed on him by Mr. Aronson, to close the deal, he advanced a check for $14,500.00 without seeking prior advice of his counsel. However, no testimony was presented to show that Dr. Armfeld ever did in fact seek advice of his counsel after the document was signed.

Mr. Aronson testified that there was never any discussion of a financing contingency prior to execution of the document; indeed, the document refers to the "Buyer" as Dr. Armfeld and/or an investor group. He further testified that there were several meetings prior to the February 28th date, and that while he was anxious to complete the deal, these negotiations took place over a one-month period.

Mr. Aronson further testified that upon the signing of this document, he informed another interested bidder that a deal had been made.

The transfer anticipated by the parties to this document never materialized, due in large part to the withdrawal from these

negotiations of Pitterich's investor group, and Dr. Armfeld's inability to obtain the necessary financing on an individual basis. Thereafter, when Mr. Aronson tried to reactivate negotiations with the other interested buyer, said buyer was no longer interested. The failure to finalize these activities caused the Debtor to seek protection under the bankruptcy laws.

## ANALYSIS

When a conflict arises as to whether the parties intended a particular writing to constitute a valid and enforceable contract, the determination of whether or not such a contract exists is a question of fact; the factfinder must determine the existence or lack thereof, based upon all of the evidence provided. *See Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 305 A.2d 689 (1973); *Johnston v. Johnston*, 346 Pa. Super. 427, 499 A.2d 1074 (1985); *Ingrassia Construction Company, Inc. v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478 (1984); *Yellow Run Coal Company v. Alma-Elly-Yv Mines, Ltd.*, 285 Pa.Super. 84, 426 A.2d 1152 (1981); *National Products Company, Inc. v. Atlas Financial Corporation*, 238 Pa.Super. 152, 364 A.2d 730 (1975).

It is axiomatic that there must be a meeting of the minds on the essential elements of the parties' agreement in order for there to be an enforceable contract. *See, Rusiski v. Pribonic*, 326 Pa.Super. 545, 474 A.2d 624 (1984), *rev'd and remanded on other grounds*, 511 Pa. 383, 515 A.2d 507 (1986); *Onyx Oils & Resins, Inc. v. Moss*, 367 Pa. 416, 80 A.2d 815 (1951); *Courier Times, Inc. v. United Feature Syndicate, Inc.*, 300 Pa.Super. 40, 445 A.2d 1288 (1982); *Yellow Run, supra; Hahnemann Medical College and Hospital v. Hubbard*, 267 Pa.Super. 436, 406 A.2d 1120 (1979). *Cf. Ingrassia, supra.* If the essential terms are settled, the contract is enforceable, even if it is an informal document which requires future approval of incidental terms. *Field, supra; Johnston, supra; Kazanjian v. New England Petroleum Corporation*, 332 Pa.Super. 1,

480 A.2d 1153 (1984); *Courier Times, supra; Yellow Run, supra.*

In the case at bar we have a document which states the subject matter to be purchased, the seller and buyer in said transaction, the purchase price, broken down into three (3) installments, the dates of the three installments, and the signatures of the representative parties. This is more than the necessary elements to find that a contract exists. The liquidated damages paragraph (Paragraph 6), questioned by Dr. Armfeld, is a valid and enforceable clause of this Agreement. The paragraph referred to by the doctor as his "out" (Paragraph 7) does not provide such a release. As stated earlier, once the essential terms of an agreement are settled, the contract is valid and enforceable, even though the document requires approval of incidental terms at a later time. These additional terms are clearly to what Paragraph 7 of the document refers.

Furthermore, it appears that Dr. Armfeld attempted to tie the hands of the Seller, while allowing himself the ultimate flexibility. Though he claims he had no opportunity to meet with his attorney, he does not explain why, during the month-long negotiations leading up to this document, he did not contact said attorney to seek advice and counsel. Furthermore, he offers no testimony or explanation as to why such advice was not sought soon after the execution, to verify his understanding of the language.

The document before the Court speaks for itself. We find no signs of ambiguity. Dr. Armfeld's assertions of haste in the execution of this document and reliance on the wisdom of another party's interpretation of the language in Paragraph 7 are tenuous; they may provide the basis for some actionable claim, but such is not the matter presently before this Court.

Having found the existence of a contract, we must now determine if the contract was breached. Dr. Armfeld argues that the contract lacks a definition of breach, and therefore, breach cannot be

determined. However, such a clause is unnecessary. It is axiomatic that a breach of contract occurs whenever one party to the contract fails to perform any contractual duty of immediate performance, or violates an obligation or duty. When a contract calls for performance by both parties and one party fails to so perform, the other contracting party is entitled to consider the agreement breached. *Just Mfg. Co. v. Falck*, 354 Pa. 421, 47 A.2d 659 (1946); *Camenisch v. Allen*, 158 Pa.Super. 174, 44 A.2d 309 (1945); 8 P.L.E. Contracts § 364 (1971).

■ Paragraph 2 of the contract indicates that $14,500.00 was to be paid upon delivery of the letter of intent; it was in fact paid at that time. The second installment of $65,000.00 was to be paid two (2) weeks later. When Dr. Armfeld was unable to secure the funds, the parties agreed to several extensions. When AII finally determined that no further extensions could be granted, and Dr. Armfeld still failed to perform, AII was entitled to consider the agreement breached. Paragraph 6 of the contract provides that if the Buyer breached the agreement, AII was entitled to retain the $14,500.00 as liquidated damages and was limited to said sum. Therefore, the $14,500.00 belongs to AII.

We turn now to the more complex issue of whether Equibank's security interest attaches to said funds.

Pennsylvania's U.C.C. (13 Pa.C.S.A.) § 9105(a) defines collateral as the property subject to a security interest. Equibank and AII entered into a Security Agreement to protect Equibank for the $85,000.00 loan made to AII. The Security Agreement provides that Equibank is secured in all of AII's equipment, inventory, receivables, and any proceeds received therefrom.

Paragraph 1(m) of this Agreement defines "receivables" quite expansively, and includes:

... all accounts, contract rights, accounts receivables, instruments, documents, chattel paper, general intangibles ... any other obligations or indebtedness owed to the Borrower from whatever source arising; all rights of the Borrower to receive any payments in money or kind ...

Equibank filed the appropriate financing statements with the necessary offices within the State and County. Therefore, Equibank has perfected its interest and is secured in AII's contract rights, including its contract with Dr. Armfeld. The contract states that if a breach occurs, the $14,500.00 deposit will be retained as liquidated damages. The contract was breached by Dr. Armfeld's nonperformance; therefore, AII's contract right is limited to the $14,500.00 sum.

Normally, our analysis would now be complete, *inter alia*, Equibank would be entitled to the fund pursuant to its security interest; however, both Dr. Armfeld and the Trustee have raised an additional argument. They assert that the $14,500.00 constitutes a deposit account, and deposit accounts cannot be the subject of security interests. Indeed, § 9105(a) defines a "deposit account" as:

... a demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit;

Furthermore, § 9104(12) specifically states:

This Article does not apply ...

(12) to a transfer of an interest in any deposit account ... except as provided with respect to proceeds (section 9–306) and priorities in proceeds (section 9–312).

Facially then, it would appear that the $14,500.00, being held in a deposit account, would be outside the coverage of Article 9.

However, U.C.C. 9–306 defines proceeds as whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Further, Section 9306(d)(1) states:

(d) In the event of insolvency proceedings instituted against a debtor, a secured party with a perfected security interest in proceeds has a perfected

security interest only in the following proceeds:

(1) in identifiable non-cash proceeds *and in separate deposit accounts containing only proceeds;*

(emphasis added). The last sentence of 9306(d)(1) was added in 1982 when Pennsylvania adopted the 1972 Amendments to the U.C.C. The account in question contains only the $14,500.00, and any interest accrued thereon. *See also, First National Bank of Amarillo v. Martin,* 48 B.R. 317, 40 U.C.C.Rep.Svc. 1521 (S.D.Tex.1985); *In re Barkley,* 31 B.R. 924, 36 U.C.C.Rep.Svc. 1378 (Bankr.W.D.Mich.1983); *In re Cooper,* 2 B.R. 188 (Bankr.S.D.Tex.1980).

The U.C.C. does not define "disposition" as in disposition of collateral. Black's Law Dictionary defines "disposition" as:

Act of disposing; transferring to the care or possession of another. The parting with, alienation of, or giving up property.

▮ We find that in return for giving up its contract right, AII received liquidated damages as proceeds of that contract; *inter alia,* the disposition of Equibank's collateral. As the liquidated damages represent proceeds of collateral; the U.C.C. provides that in an insolvency proceeding, a deposit account containing only proceeds of secured collateral remains secured; and Equibank's Security Agreement and financing statement cover both the contract as collateral and proceeds thereof, we find that Equibank's security interest attaches to the $14,500.00 deposit account.

Equibank is owed $66,991.61. The deposit account contains $14,500.00 plus interest accrued. Clearly, AII has no equity therein, and relief from stay should be granted.

An appropriate Order will be issued.