**In re SUMMIT AIRLINES, INC., Debtor.**

**Bankruptcy No. 88–10911S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 19, 1988.

Marjorie L. McMahon, Esquire Philadelphia, Pa., for Extra Executive Transport Luftverkehrsgesellschaft, mbH.

Allen B. Dubroff, Philadelphia, Pa., for debtor.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa., United States Trustee.

Mary F. Walrath, Philadelphia, Pa., for Committee.

Michael L. Temin, Philadelphia, Pa., for Chrysler Credit Corp.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The so-called "Motion for Reclamation Pursuant to Section 554(b) of the Bankruptcy Code" before us in the instant case, filed by Extra Executive Transport Luftverkehrsgesellschaft, mbH (hereinafter referred to as "the Movant"), presents to us as a compelling factual setting in search of a legal basis for the relief sought. Despite the presentation of several misplaced legal theories by the Movant in its submissions, we believe that a firm legal basis for most of the relief sought does exist. We hold that all of the funds in, and reasonably traceable to, an escrow fund created by the Movant's deposits pursuant to an agreement of sale of certain aircraft, frustrated by the Debtor's rejection thereof pursuant to 11 U.S.C. § 365(d)(1), are not property of the Debtor's estate in which the estate has an equitable interest, entitling the Movant to possession thereof. We also hold that funds properly taken out of the account and dispatched to make repairs to the aircraft prior to the Debtor's rejection of the contract have been sufficiently traced from the account to the aircraft to negate any equitable interest of the Debtor's estate in those funds. However, we cannot reach the conclusion that funds withdrawn by the Debtor itself for its own expenses or for its legal services are so traceable. Therefore, we grant the Movant recovery of all funds in the account, plus providing that it is entitled to $150,030.00, the sum dispatched to make the repairs, from the proceeds of the sale of the aircraft.

The underlying bankruptcy case began as an involuntary Chapter 7 filing on March 18, 1988, although, on the Debtor's Motion, an Order for relief was entered under Chapter 11 of the Bankruptcy Code on May 9, 1988. On June 10, 1988, the Debtor filed a Motion to sell four aircraft, substantially all of the Debtor's assets, to European Air Transport (hereinafter "European") for $6,830,000.00. Shortly thereafter, on June 14, 1988, the Debtor filed a motion seeking to reject an Aircraft Purchase Agreement of June 30, 1987, between it and the Movant (hereinafter "the Agreement"), whereby the Movant was to purchase the same four aircraft from the Debtor for $6,000,000.00. Ultimately, on July 6, 1988, we granted the Debtor's motion to reject the Agreement with the Movant and, on July 8, 1988, we conducted an auction sale of the aircraft. At that sale, GPA Group Limited (hereinafter "GPA") purchased the aircraft for $6,600,000.00 on an "as-is, where-is" basis, a basis more attractive to the Debtor than that in the proposed sale to European for $6,830,000.00.

The instant motion was filed by the Movant on September 20, 1988. The underlying Agreement of June 30, 1987, contemplated that certain repairs would be made to the aircraft in connection with the purchase. Since the financially-troubled Debtor could not afford to pay for these repairs, a Deposit Escrow Account Agreement was appended to the Agreement. The Escrow Agreement provided that the Movant would pay $500,000.00 into an Escrow Fund, $100,000.00 from which would be advanced to the "Overhaul Center" upon delivery of each of the four aircraft to the "Overhaul Center" and $50,000.00 of which could be released to the Debtor for its expenses at the time of the delivery of the first aircraft thereto. As of the March 7, 1988, date when the bankruptcy petition was filed against the Debtor, it was alleged that Samuel J. Bailey, Esquire (hereinafter "Bailey"), pre-petition counsel for the Debtor and the escrow agent, had disbursed $150,030.00 to Hayes International (hereinafter "Hayes"), apparently the designated

"Overhaul Center," towards the repairs of two aircraft delivered, and that $27,789.00 had been released to the Debtor for its services. The Movant therefore sought an order directing that it be paid $177,829.00 [1] out of the proceeds of the sale to GPA.

The only party choosing to answer this motion was the Official Unsecured Creditors' Committee (hereinafter "the Committee") of the Debtor. In a pleading filed on October 7, 1988, the Committee not only opposed any payment to the Movant from the sale proceeds, but also it included, in the same pleading, a "Cross–Motion" seeking an accounting of all of the proceeds in the escrow fund and a directive that all sums located therein be turned over to the Debtor.

A hearing was conducted on November 2, 1988. Testifying for the Movant were Bailey; Reinhard Lange, the Movant's President; and Gerard Powers, an agent of GPA involved in the bidding on July 8, 1988. Bailey testified that the Movant had deposited $499,991.50 into the account pursuant to the Agrement in January, 1988; that disbursements of $150,030.00 to Hayes, $27,789.00 to the Debtor, and $20,000.00 to his firm for legal services had been made; and that, after adding accumulated interest, $318,188.89 remained in the escrow account as of October 1, 1988. Lange testified that he had made periodic checks with Hayes, and was quite certain that repairs had been made to the aircraft with the funds dispatched to it, as contemplated. Powers testified that the fact that Hayes had made these repairs was crucial to its willingness to bid and consummate the sales transaction. The Committee presented no witnesses.

■ Initially, the Movant questions the standing of the Committee to assert the claim for a turnover on behalf of the Debtor and disputes the use of the procedural device of a "Cross–Motion" for this purpose. It contends that the Committee was, initially, obliged to request a turnover of property by means of an adversary proceeding, pursuant to Bankruptcy Rule (hereinafter "B.Rule") 7001(1). The Committee responds by contending that the Debtor's failure to assert defenses or claims in response to the Movant's pleading provided it with standing to do so, and that its answer to the motion is effectively an objection to a proof of claim which, when "joined with a demand for relief of the kind specified in Rule 7001 [automatically] becomes an adversary proceeding." B.Rule 3007.

We agree that the Committee has standing to assert the defenses and claims which it does. Clearly, the Debtor failed to defend, and the Committee's defense to at least a portion of the Movant's claim was meritorious. See *In re Nicolet, Inc.*, 80 B.R. 733, 737–40 (Bankr.E.D.Pa.1987). See also *Louisiana World Exhibition v. Federal Insurance Co.*, 858 F.2d 233, 247–53 (5th Cir.1988); and *In re Morrison*, 69 B.R. 586, 588–90 (Bankr.E.D.Pa.1987).

■ However, we agree with the Movant that the Committee utilized the wrong procedural tool to assert its claim for turnover. A "Cross–Motion," unless itself accompanied with all of the adornments required by B.Rule 9014 and Local Bankruptcy Rule 9014.1, is never a proper pleading. For, unless it is filed with such enclosures, its presentation deprives other interested parties of the notice and opportunity to respond to which they are entitled as to any motion which is properly filed on its own. Moreover, the turnover request should have been made by an adversary proceeding. It is no answer at all to state, as the Committee does, that, in *In re Ford*, 78 B.R. 729 (Bankr.E.D.Pa.1987), we allowed a pro se debtor, without objection (which has been made here), to raise a turnover request by motion. We are also unimpressed by the belated invocation of B.Rule 3007. If any aspect of this matter did "become" an adversary proceeding, the Committee has not proceeded in asserting its claims in the form provided for under Part VII of the B.Rules, either.

---

1. We note, however, that the sum of $150,030.00 and $27,789.00 is only $177,819.00, not $177,829.00, as alleged by the Movant.

At the hearing, we attempted to defuse the procedural issue by indicating that we would allow the Movant to address its right to the funds still held by Bailey in escrow, as well as the monies disbursed from the escrow fund, and decide this issue also. Allowing this dispensation to the Movant, which requires us to address its rights to all of the funds vis-a-vis all other interested parties, and the fact that we hold that no funds should in fact be turned over to the Debtor, as the Committee requests, prompt us to address all issues raised by the parties on their merits.

Substantively, the Movant is guilty of cluttering its motion and Brief with contentions which deflect from those of its claims which have merit. Clearly, it is not appropriate to suggest, under the Code, as opposed to possibly under the quite distinct predecessor Bankruptcy Act, that reclamation can occur pursuant to 11 U.S.C. § 554(b). The latter Code provision deals with abandonment of what *is* property of the estate. Here, the thrust of the Movant's argument is that the property in issue is *not* property of the estate. The only reference to "reclamation" in the Code concerns the enforcement of the right to same under 11 U.S.C. § 546(c). It appears to us that what the Movant is seeking, substantively, is a determination of its interest in certain property, which itself should have been instituted as an adversary proceeding, pursuant to B.Rule 7001(2). However, in the context of arguing the propriety of the Committee's own filing, neither the Committee nor any other party raised an objection to the Movant's method of proceeding, and hence we deem any objections thereto to be waived.

■ Substantively, the Movant's attack is scattered. Its reference to 11 U.S.C. § 365(j) is misplaced; that section clearly relates to rights under executory contracts to purchase *real estate*. The concepts of restitution and claims of an equitable lien, apart from what the Code directly allows, are also of little help to creditor in a bankruptcy scenario, in which there are scores of creditors with just claims against the Debtor, none of which are likely to be made whole. All creditors are entitled only to that which the distribution plan of the Code allows them. The claim of a constructive trust requires the presence of fraud (or its like) and a promise by the transferee to hold the property in trust, or the presence of a claim of unjust enrichment which would entitle the transferor to restitution. *Kohr v. Kohr*, 271 Pa.Super. 321, 328–29, 413 A.2d 687, 690–91 (1979). *See also Stauffer v. Stauffer*, 465 Pa. 558, 569–78, 351 A.2d 236, 241–46 (1976). However, the theory of unjust enrichment is generally inapplicable where, as here, the parties' relationship is based upon a written contract. *Schott v. Westinghouse Electric Corp.*, 436 Pa. 279, 290–92, 259 A.2d 443, 448–49 (1969); and *Third National Bank & Trust Co. v. Lehigh Valley Coal Co.*, 353 Pa. 185, 193, 44 A.2d 571 (1945). Moreover, the trust theory has been narrowly applied in the bankruptcy context, because its invocation tends to frustrate the Code's normal process for distribution of assets. *See, e.g., In re Auto–Train Corp.*, 810 F.2d 270, 273–74 (D.C.Cir.1987); *In re Lewis w. Shurtleff, Inc.*, 778 F.2d 1416, 1419–20 (9th Cir.1985); and *In re E & S Comfort, Inc., Baehr v. International Revenue Service Center*, 92 B.R. 616, 621 (Bankr.E.D.Pa. 1988). *Cf. In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 564–67 (8th Cir.1988) (court rejects application of "earmarking doctrine").

■ We are, however, impressed with the argument that the funds deposited into the escrow fund may not be property of the Debtor's estate or, if they are property of the estate, that the Debtor has only bare legal title thereto, which, under 11 U.S.C. § 541(d), gives the estate no equitable interest therein. *See In re Temp–Way Corp.*, 80 B.R. 699, 702–05 (Bankr.E.D.Pa. 1987). We recently had occasion to review several of the pertinent decisions in the "escrow account" area in *In re TM Carlton House Partners, Ltd., TM Carlton House Partners, Ltd., et al. v. Career Planners, Inc., et al.*, 93 B.R. 859, 865–86 (Bankr.E.D.Pa. 1988). There, we emphasized that it is significant to determine

what party was the depositor of the funds into an escrow account, because the depositor generally has legal title thereto. *Id.* at 866. We declined to hold that the landlord-debtor there, who had not deposited the funds, had any sort of absolute right to a turnover of escrow deposits. *Id.* at 871–72.

The cases which we believe are most analogous to the instant factual setting are *Gulf Petroleum, S.A. v. Collazo,* 316 F.2d 257 (3d Cir.1963); and *Creative Data Forms, Inc. v. Pennsylvania Minority Business Development Authority,* 72 B.R. 619 (E.D.Pa.1985), *aff'd,* 800 F.2d 1132 (3d Cir.1986). In *Creative Data Forms,* a deposit was made into an escrow account by the defendant state authority, which was to be paid to the debtor upon his performance of certain services, which he never in fact did perform. The district court affirmed this court's conclusion that the funds on deposit were not property of the estate. 72 B.R. at 623–24. In *Gulf Petroleum,* funds were deposited into escrow by the buyer under an executory contract to purchase realty, which, like here, was rejected by the debtor-seller. Reversing the bankruptcy court and the district court, the Court of Appeals concluded that all funds which remained in possession of the debtor or which could be traced to the funds deposited into the escrow account should be returned to the buyer. 316 F.2d at 361–62.

The Committee argues that the funds were placed into a bank account of the *debtor* and were therefore presumptively its funds. However, it concedes, as it must, the important fact that the Movant was the depositor of the funds. The precise title of the account was "Robinson and Cole [Bailey's firm] Esc/Agt for Summit Airlines and Extra Airlines," but the Committee argues that, since the tax identification number of the Debtor was used on the account, it must be considered to be the Debtor's account. There are several answers to this argument of the Committee. First, the title of the account itself, as well as the undisputed testimony at the hearing, indicated that the account was meant to be at least a joint account of the Debtor with the Movant. Hence, the presumption that the funds belonged exclusively to the Debt-

or is overcome. *Cf. In re American Plastics Service, Inc.,* 63 B.R. 113, 114–15 (Bankr.E.D.Pa.1986). Secondly, we note that, in both *Creative Data Forms* and *Gulf Petroleum,* the funds in issue there were placed into accounts which were titled *exclusively* in the respective debtors' names. This did not change the decisions in those cases that the funds deposited therein were *not* property of the respective debtors' estates to which the debtors had a right of possession. Finally, as the *Temp–Way* decision points out, legal title of the Debtor in the funds does not necessarily establish the Debtor's right to retain them. *See* 72 B.R. at 702–05. As in *Temp–Way,* the Debtor here has no equitable interest whatsoever in these funds, and therefore they must be turned over to the Movant.

The foregoing analysis makes clear that the Movant is entitled to the $318,188.59 sum, or whatever the amount that still remains in the escrow account held by Bailey. However, the Movant's entitlement to the recovery of the funds removed from the account, allegedly to repair the aircraft, is less clear. As *Gulf Petroleum* holds, the buyer-depositor is only entitled to those funds which it can trace after they have left the account. 316 F.2d at 261–62.

The problem of tracing funds has often arisen in the context of bank accounts or trust funds which have allegedly been converted by the entities holding them. The commentaries have indicated that there is a trend away from earlier decisions holding that any commingling of funds precludes tracing. 39 P.L.E. 318–21 (1961); S. Hirsch, *Tracing Trust Funds—Modern Doctrines,* 11 TEMPLE L.Q. 11, 20–27 (1936). Thus, more recent decisions have looked to the practicalities of the disposition of funds in issue to determine whether they can in fact be reasonably said to be traceable. *See In re Penn Central Transportation Co.,* 486 F.2d 519, 523–27 (3d Cir.1973) (freight and passenger charges collected by railroad as a transmitting agent held traceable despite the commingling of these funds with those of other shippers); *In re Erie Trust Co. of Erie,* 326 Pa. 198, 206–08, 191 A. 613, 617–18

(1937) (trust properly deposited in a bank can be traced as a unit of cash distinct from other assets); and *In re Vosburgh's Estate,* 279 Pa. 329, 332–33, 123 A. 813, 814–15 (1924) (bank's commingling of funds does not destroy trust fund as to sum on deposit as long as bank has cash on deposit that is at least equal to the amount of the fund).

The Committee cites to several of our decisions relating to "tax trusts" for the principle that such trusts can be recognized only if the taxing authority is able to establish that the funds deposited for taxes are intact or can be traced in the hands of the debtor. However, in addressing the burden of a taxing authority in such a circumstance in *E & S Comfort, supra,* 92 B.R. at 622, we held that "the 'reasonable assumption' rule rather than the 'strict tracing' rule" must be applied. *See also, e.g., Drabkin v. District of Columbia,* 824 F.2d 1102, 1115–17 (D.C.Cir.1987).

■ Applying such a rule here, we believe that it is reasonable to assume that all funds released from the Debtor's account to Hayes were in fact expended on repairs and should be credited to the Movant from the sale proceeds. Both Bailey and Lange testified without rebuttal that payments were forwarded by the Debtor to Hayes for the express purpose of making repairs to the aircraft. Lange testified that he periodically checked with Hayes as to progress on the repair work done with the proceeds. We are at a loss to speculate as to what more evidence the Movant could reasonably have presented to establish that funds were transferred from the Movant, to the account, to Hayes, to the aircraft, in accordance with the terms of the escrow agreement appended to the Agreement. We do not consider it necessary for the Movant to establish that particular cash from the account could be translated to any particular repairs on the aircraft. In sum, the tracing established by the Movant here, under the circumstances, appears equally as conclusive as that in *Penn Central, Erie Trust,* and *Vosburgh.*

Further, the testimony of Powers that the repairs effected by Hayes yielded a higher bid from GPA appears sufficient to support the conclusion that the repairs effected by Hayes were translated into a higher purchase price for the aircraft. We note that this link in the Movant's chain of proof may be unnecessary. As *Gulf Petroleum* suggests, the only necessary elements are proving that funds in an escrow account were withdrawn in accordance with the terms of the escrow contract and can be traced to that account. 316 F.2d at 261–62.

However, we are unable to reach the same conclusion regarding the $27,789.00 released to the Debtor and the $20,000.00 paid to Bailey's firm for legal services from the escrow funds. Although, under the escrow agreement, a release of $50,000.00 to the Debtor "for its expenses" was permissible at the time of the delivery of the first aircraft, it is not clear what "expenses" of the Debtor were in fact paid with those advances. While it is clear that $20,000.00 was paid for legal fees, the connection of such fees to the sale transaction is unclear. We cannot agree that the connection between these withdrawals and the repairs to the aircraft is anywhere near as apparent as that of the payment to Hayes for its services. The Debtor could have used the funds withdrawn by it for anything, including totally unauthorized purposes. There is no evidence whatsoever indicating for what these funds were in fact used. The legal fees obviously could have been incurred for any matter, not only services in connection with the aircraft sale. Bailey, who should have been particularly capable of so doing, failed to provide any testimony showing a connection of these fees to the "expenses" of the Debtors in connection with the Agreement. Therefore, we conclude that the Movant has failed to meet its burden of tracing these funds to purposes in accordance with the terms of the escrow contract. Consequently, we shall direct that only $150,030.00 shall be paid to the Movant out of the proceeds which has been generated by

the sale of the aircraft.[2]

An appropriate Order, consistent with this Opinion, will be entered.

## ORDER

AND NOW, this 19th day of December, 1988, after a hearing of November 2, 1988, on the "Motion for Reclamation" filed by Extra Executive Transport Luftverkehrsgesellschaft, mbH (hereinafter referred to as "the Movant"), "Pursuant to Section 554(b) of the Bankruptcy Code," and the "Cross–Motion for the Turnover of Property of the Estate Pursuant to Section 542 of the Bankruptcy Code" filed by the Official Unsecured Creditors' Committee (hereinafter "the Committee"), it is hereby ORDERED as follows:

1. The Motion of the Movant is GRANTED IN PART.

2. The "Cross–Motion" of the Committee is DENIED.

3. The Debtor, by its agent, Samuel J. Bailey, Esquire, is directed to turn over all sums remaining in the escrow account entitled "Robinson and Cole Esc/Agt for Summit Airlines and Extra Airlines" to the Movant.

4. The Movant is entitled to receive the sum of $150,030.00 from the proceeds of the sale of the four aircraft in issue, authorized by this court by Order of July 8, 1988. Same shall be paid to the Movant upon distribution of the sale proceeds.

---

**2.** We also reject the Committee's contention that 11 U.S.C. §§ 365(g) and 502(g) necessarily relegates all of the Movant's claims to general unsecured status. The Movant's claims are created by its rights in the escrow fund, not its independent rights as a "rejectee" of an executory contract. Nothing in the §§ 365(g) or 502(g) suggest that a "rejectee" should lose rights which it otherwise would have as a result of the rejection. Other damages arising from the breach of the Agreement could be requested under §§ 365(g), 502(g). *See Gulf Petroleum, supra,* 316 F.2d at 262.