**In re QUAKER DISTRIBUTORS, INC., Debtor.**

**Bankruptcy No. 95–10047DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

Nov. 29, 1995.

John E. Kaskey, Philadelphia, PA, for Debtor.

Robert A. Kargen, Lesser & Kaplin, P.C., Blue Bell, PA, for Midlantic Bank, N.A.

Paul J. Brenman, Philadelphia, PA, for Creditors' Committee.

Neal D. Colton, Cozen & O'Connor, Philadelphia, PA, for Spring Window Fashions Division, Inc.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Objections filed by MIDLANTIC BANK, N.A. ("the Bank") to the final fee application ("the Application") of Fellheimer Eichen Braverman & Kaskey ("Counsel"), appointed as general counsel for QUAKER DISTRIBUTORS, INC. ("the Debtor"), raise two issues: (1) does this court have jurisdiction over the issue of whether Counsel can be paid from the proceeds of a "security retainer" when the Bank claims a prior security? and (2) does the Bank in fact have a prior security interest in these proceeds?

We conclude that we have jurisdiction to decide the issue of whether Counsel can be paid from the proceeds. Finding that the Bank in fact has a security interest prior to that of Counsel under 13 Pa.C.S. § 9306(d)(1) of the Pennsylvania Uniform Commercial Code ("the UCC"), we refuse Counsel's request to be paid out of the Bank's collateral. However, we do not believe that it is appropriate for this court to direct a "turnover" of the proceeds to the Bank. If Counsel does not invoke 11 U.S.C. § 506(c) to recover the proceeds out of the Bank's collateral within the short time frame allotted for it to do so, the Bank is relegated to the state courts to obtain such relief.

### B. FACTUAL AND PROCEDURAL HISTORY

The Debtor filed a voluntary corporate Chapter 11 bankruptcy case on January 4, 1995. After several drafts of a plan, the Debtor, by Counsel, announced, at a continued confirmation hearing of August 9, 1995, that it was no longer contesting a motion of the Bank to obtain relief from the automatic stay to foreclose upon its broad security interest including, *inter alia,* the proceeds of the Debtor's accounts receivable, and would file a motion to voluntarily dismiss this case. On September 6, 1995, this court granted the Debtor's uncontested motion to dismiss, but, in its dismissal Order, required Counsel and any other professionals requesting compensation greater than $500 from the Debtor's estate to file final fee applications on or before September 18, 1995.

On September 18, 1995, Counsel filed the instant Application in response. In the Application, the Debtor recited that it had received a pre-petition retainer of $95,393.22, a portion of which was utilized by the Debtor to pay an interim fee and cost reimbursement allowance of July 24, 1995, in the total amount of $60,571.77. The Application requested additional compensation of $33,666.00 and $6,357.24 as additional reimbursement for costs.

On October 6, 1995, the Bank filed Objections to the Application ("the Objections"). In the Objections, the Bank asserted that it had a security interest in all of the Debtor's proceeds under 13 Pa.C.S. § 9306 of the UCC; that the retainer consisted of funds subject to that security interest; that the balance of the retainer should be paid to it unless Counsel was allowed to charge its fees against the Bank's collateral under 11 U.S.C. § 506(c) (which relief had not been requested); and that Counsel should disgorge to the Bank the fees already paid to it from the retainer. The Objections and the Application were listed for a hearing on November 8, 1995.

Our pre-hearing independent review of the Application, in light of several disallowances and a downward adjustment of the hourly rate requested by Attorneys Kaskey and Goodkind from $275/hour to $250/hour, consistent with our decision in *In re Dubin Paper Co.,* 169 B.R. 115, 119, 124–25 (Bankr. E.D.Pa.1994), resulted in our conclusion that an award of $31,128.50 in additional compensation and $6,243.44 in additional reimbursement of costs, for a total of $37,371.94 payable to Counsel, was justified. Therefore, unless the Objections were sustained, we

would allow Counsel to exhaust the balance of the retainer of $34,821.45 in Counsel's escrow account to collect the balance of its allowed compensation.

■ In a colloquy at the hearing of November 8, 1995, Counsel disputed this court's jurisdiction to consider the Objections, contending that it was only empowered to review the amount requested in the Application. The Bank agreed to withdraw its claim for disgorgement of the $60,571.77 already paid and confined its demand to a claim for the balance of the escrowed funds.[1] In making a record, the Bank was allowed to admit copies of its loan documents and a transcript of a deposition of October 26, 1995, of Robert J. Caplan ("Caplan"), the Debtor's president, taken by the Bank in preparation for this hearing.

In his deposition, Caplan stated that the Debtor's normal practice was to deposit accounts receivable collected into an account at the Bank. However, he testified that, in late December 1994, Counsel instructed him to open a new account at another bank. Pursuant to these instructions, Caplan opened an account at Meridian Bank ("Meridian") and deposited therein three days' accounts receivable, amounting to about $125,000. He then followed further instructions from Counsel to wire about $90,000 (apparently $95,393.22) from the Meridian account to Counsel. Although Caplan has testified that he was unaware of any obligation to do so, the parties' Extension Agreement referencing the loan, at ¶ 10, requires that all accounts receivable collections be deposited in an account at the Bank.

After the hearing, we allowed the parties until November 17, 1995, to simultaneously submit briefs in support of their respective positions. Both parties filed timely submissions.

## C. DISCUSSION

### 1. THIS COURT HAS JURISDICTION TO DECIDE THE ISSUE OF WHETHER COUNSEL IS ENTITLED TO BE PAID OUT OF THE ESCROWED RETAINER.

■ Initially, Counsel attempts to escape the potential loss of a portion of its retainer by arguing that the dismissal of this case deprives this court of jurisdiction to grant the relief sought by the Bank, i.e., its recovery of the retainer. According to the Debtor, 11 U.S.C. §§ 349(b)(2), (b)(3) would require, upon dismissal of this case, that any turnover of property under 11 U.S.C. § 542 be vacated, and would revest any property of the estate in the Debtor, respectively. As a result, so this argument goes, the Bank is asking this court to grant relief of which the dismissal itself would require the undoing.

■ We agree with the Debtor in part. We find that it is indeed inappropriate for the Bank to demand a "turnover" of the escrowed funds to it, under 11 U.S.C. § 542 or otherwise. A turnover, as described in § 542, contemplates only a turnover of property to a debtor, as opposed to a demand by a non-debtor against a debtor. See In re Munoz, 83 B.R. 334, 338–39 (Bankr.E.D.Pa. 1988); and In re Moore & White, Co., 83 B.R. 277, 284–85 (Bankr.E.D.Pa.1988). The Bank, as is noted above, has had relief from the automatic stay since September 6, 1995, and is properly relegated to the state courts to obtain the affirmative relief which it seeks.

It appears proper to characterize the retainer in issue as "property of the estate" of the Debtor. See In re Prudhomme, 43 F.3d 1000, 1004 (5th Cir.1995); In re Baltic Associates, L.P., 1994 WL 791634, slip op. at *2 (Bankr.E.D.Pa. March 16, 1994); and In re Chicago Lutheran Hospital Ass'n, 89 B.R. 719, 734 n. 21 (Bankr.N.D.Ill.1988). Howev-

---

**1.** As the Bank apparently recognized in withdrawing its belated request for disgorgement, while this court may have been empowered to order a disgorgement of fees paid, cf. In re Metropolitan Electric Supply Corp., 185 B.R. 505 (Bankr.E.D.Va.1995) (Chapter 11 professionals forced to disgorge interim compensation allowed after conversion of case to Chapter 7 resulted in insufficient funds to pay all administrative

claims), it is always difficult to undo a distribution of funds already effected, and such relief should generally be confined to "extraordinary situations." See In re B. Cohen & Sons Caterers, Inc., 147 B.R. 369, 376–77 (Bankr.E.D.Pa.1992); and In re Wilson, 1993 WL 78214 (Bankr.E.D.Pa. March 15, 1993), aff'd, 1993 WL 483326 (E.D.Pa. November 17, 1993).

er, the fact that the Debtor's right in such "property of the estate" will revest in the Debtor after a dismissal of a case does not resolve the issue of the rights of third parties in that property vis-a-vis the Debtor. A debtor must establish the estate's right to retain "property of the estate." *See In re Jones,* 179 B.R. 450, 454–55 (Bankr.E.D.Pa. 1995) (determination of status of property as "property of the estate" is not determinative of the debtor's right to retain that property).

■ We believe that it is more significant to the matter at issue to observe that it involves a debtor's transactions with its professionals, which this bankruptcy court is charged to oversee *sua sponte* in every case. *See* 11 U.S.C. § 329; and *In re Busy Beaver Building Centers, Inc.,* 19 F.3d 833, 840–45 (3d Cir.1994). The oversight of the bankruptcy court should and hence must not end upon the mere dismissal of a case, lest overreaching counsel could frustrate the requisite court review by the simple medium of encouraging the debtor to seek dismissal. *See In re Fricker,* 131 B.R. 932, 938 (Bankr. E.D.Pa.1991). In any event, there is no reason to conclude that dismissal of a case could or should eliminate bankruptcy court review of a debtor's transactions with its professionals.

Moreover, this court asserted its intention to require and review final fee applications from all professionals in its dismissal Order of September 6, 1995. Since there was no appeal from that Order, court review of final fee applications has been firmly established as the law of this case.

Counsel appeared to concede that this court did have some power to review the Application, but argued that its power was confined to fixing the amount of its fee. Thus, it was only this court's consideration of the Bank's efforts to assert its security interest against a fixed fee amount to which Counsel actually objected. We agree that the Bank's efforts at seeking affirmative relief are misplaced, as noted at pages 67–68 *supra.*

■ However, we believe that, even after dismissal of a case, a bankruptcy court is obliged to review all aspects of a profession-

al's own demands for approval of its sources of compensation, just as if the case were still active. In this regard, in *In re Orfa Corp. of Philadelphia,* 170 B.R. 257, 269–70 (E.D.Pa. 1994), the district court approved our postdismissal consideration of a motion of a bankruptcy trustee to recover compensation from the property of a secured creditor, pursuant to 11 U.S.C. § 506(c). This holding also answers the implicit question of whether this court would consider Counsel's § 506(c) motion against the Bank in light of Counsel's absence of success in contesting the Bank's prior security interest in the retainer proceeds. We would indeed have jurisdiction over such a motion, and we will expressly grant Counsel until December 11, 1995, to file such a motion. We also note that, in *Fricker, supra,* 131 B.R. at 938–41, we considered issues of a professional's duty to disclose his compensation and the timing of fee applications, as well as reviewing, postdismissal, the reasonableness of counsel's request for compensation. We continue to believe that these actions were not only appropriate, but also were a necessary aspect of the discharge of our duty to review applications for professionals' compensation *sua sponte.*

We therefore conclude, without hesitancy, that we have the duty, as well as the power, to decide whether Counsel may receive payment of the amount allowed in the Application from the retainer. We must therefore proceed to address the issue of whether the Bank has a prior security interest in the retainer proceeds which will preclude Counsel's recovery of same.

2. *COUNSEL IS NOT ENTITLED TO DRAW UPON ITS RETAINER BECAUSE THE BANK HAS A PRIOR SECURITY INTEREST IN THE RETAINER PROCEEDS PURSUANT TO 13 PA.C.S. § 9306(d)(1) OF THE PENNSYLVANIA UCC.*

■ The Bank asserts an uncontested security interest in the proceeds of the Debtor's accounts receivable pursuant to 13 Pa. C.S. § 9306 of the UCC. The Debtor offers a half-hearted contention that the Bank has failed to prove that the proceeds of the re-

tainer were derived from collection of accounts receivable which were not commingled with proceeds from other sources. However, the deposition testimony of Caplan indicates that the retainer funds were derived solely from the Meridian account, the sums in which came, in turn, solely from three days of accounts receivable collections by the Debtor. Applying the requisite "reasonable assumptions" regarding tracing of funds, *see In re Summit Airlines, Inc.*, 94 B.R. 367, 372 (Bankr.E.D.Pa.1988), *aff'd*, 102 B.R. 32 (E.D.Pa.1989), this testimony establishes that the retainer was derived solely from proceeds of the Debtor's accounts receivable, in which the Bank had a valid security interest, at least pre-petition.

The Bank contends that 13 Pa.C.S. § 9306(d), which provides in pertinent part as follows, extends its pre-petition security interests to the post-petition period:

**(d) Effect of insolvency proceedings.**—In the event of insolvency proceeding instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

(1) in identifiable noncash proceeds and in separate deposit accounts containing only proceeds.

(2) in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;

(3) in identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; and

(4) in all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is

(A) subject to any right of set-off; and

(B) limited to an amount not greater than the amount of any cash proceeds received by the debtor within ten days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (1) through (3) of this subsection (d).

■ At this juncture, it is helpful to review the applicable law relevant to bankruptcy court treatment of pre-petition retainers paid to a debtor's professionals. Three types of retainers have been identified by the courts in *In re Heritage Mall Associates*, 184 B.R. 128, 131–32 (Bankr.D.Or.1995); *In re Montgomery Drilling Co.*, 121 B.R. 32, 37–38 (Bankr.E.D.Cal.1990); and *In re McDonald Bros. Construction, Inc.*, 114 B.R. 989, 997–1002 (Bankr.N.D.Ill.1990): (1) classic retainers, in which a payment is made for the mere privilege of hiring the professional, without consideration of compensation for services; (2) security retainers, in which the retained sum is held by the professional in escrow to secure future compensation as allowed by the bankruptcy court for services rendered; and (3) advance payment retainers, in which payment is made to the professional immediately, but it is understood that the payments, as subsequently allowed by the bankruptcy court, are to be earned through services ultimately to be performed by the professional.

■ It is possible for a bankruptcy court to authorize any of these three types of retainers, but it is essential that the precise terms of any retainer agreement be disclosed in the application of the professional for appointment by the court, pursuant to 11 U.S.C. § 329(a) and Federal Rule of Bankruptcy Procedure ("F.R.B.P.") 2016. Failure to do so may result in full denial of compensation by the professional and disgorgement of any retainers received. *See Fricker, supra*, 131 B.R. at 938–39. *Cf. In re Park–Helena Corp.*, 63 F.3d 877 (9th Cir.1995) (entire fee denied and entire retainer ordered disgorged because counsel failed to completely disclose the source of the retainer). As a result of the disclosures made by the professionals, interested parties, including the United States Trustee ("the USTE"), may and often do object to retainer arrange-

ments, and they must be approved by the court after consideration of all objections and its own independent consideration of same.

■■■■■ In this court, it is assumed that a retainer not disclosed in more detail contemplates the terms of a security retainer, as defined above. Other terms should certainly be very specifically disclosed. Even if there is no objection by any interested party, this court is assumed to have the power to deny or modify the proposed terms of retainers *sua sponte.* Usually we will schedule a hearing on the application of the professional, and request the input of the USTE, if this court is concerned about the terms of a retainer requested.

*Montgomery Drilling, supra,* 121 B.R. at 38; and *McDonald, supra,* 114 B.R. at 1001, held that only "security retainers" remain property of the debtors' estates. The cases cited at page 67 *supra* for the principle that retainers are "property of the estate" of the debtors were addressing such "normal" "security retainers."

The instant $95,393.22 retainer escrowed by Counsel was obviously a "security retainer." Its presence was accurately so disclosed, and no objection was raised by the Bank, the USTE, or this court *sua sponte* on that assumption.

■■■■ As this designation as a "security" retainer indicates, and Judge Raslavich of this court has expressly held in *In re D'Anna,* 177 B.R. 819, 826–27 (Bankr. E.D.Pa.1995); and *Baltic Associates, supra,* slip op. at *2, a professional intends to and does obtain a security interest in funds deposited on account of a "security retainer." Counsel therefore has a security interest in the $95,393.22 sum which it holds in escrow. The issue is whether this security interest is prior to, or subordinate to, any post-petition extension of the recognized pre-petition security interest of the Bank in the same sum, as proceeds of the Debtor's accounts receivable.

■■■■ The Bank argues that 13 Pa.C.S. § 9306(d) generally preserves its prior security interest in the funds in the retainer account because they were identifiable pre-petition cash proceeds of the Bank's security interest in accounts receivable which have not been commingled with other funds. The Bank has indeed shown, to our satisfaction, that the escrowed funds are identifiable pre-petition cash proceeds of the Debtor's accounts receivable which were not commingled with other money. However, the Bank fails to indicate the specific subsection of § 9306(d) upon which it relies, particularly as between § 9306(d)(1) or § 9306(d)(2). Counsel, assuming that the Bank was relying exclusively on § 9306(d)(2), argues that the Debtor's pre-petition deposit of the $95,-393.22 in funds into the Meridian bank account and the ultimate transfer of these funds into Counsel's escrow account constituted a deposit of the retained funds into a "deposit account" prior to the bankruptcy, which constitutes an exception to the extension of the Bank's pre-petition security interest to these funds.

We believe that the language of § 9306(d), particularly in describing the inter-relationship of the first three subsections, falls short of being a model of clarity. In order to interpret this UCC section and understand the inter-relationship of its sub-sections, we found it necessary to identify the history and meaning of this section as a whole.

■■■ After the 1972 amendments to the UCC, it was no longer necessary to list "proceeds" as a specific item of collateral in a secured creditor's financing statement in order to be perfected in such proceeds. The drafters assumed that it was only commercially reasonable to expect that a secured creditor would want a security interest in whatever was given in exchange for its primary collateral and decided to require only a proper filing covering the underlying collateral in order to perfect an interest in the proceeds of that collateral as well. *See generally* Official Statement of Reasons for 1972 Change in Official Test [of UCC]; and J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE, § 24–11, at 345–46 (3d ed. 1988). As we noted above at page 70 *supra,* there appears to be no dispute that the Bank held a properly perfected pre-petition security interest in the Debtor's accounts receivable.

In determining whether the Bank retained a security interest following the Debtor's "insolvency proceeding," which clearly includes a bankruptcy filing, under § 9306(d), we begin by analyzing the purpose of this Code section. *Cf. In re Security Aluminum Co.,* 9 U.C.C.Rep.Serv. 47, 51, 1971 WL 17933 (Bankr.E.D.Mich.1971) ("The sections of [§ 9306(d) ] dealing with identifiable proceeds and the sections dealing with non-identifiable proceeds are addressed to separate problems and the language employed in these sections must be read in light of the problems involved and the legislative solution adopted."). The drafters of § 9306(d) intended to create straightforward rules for determining the scope of a secured parties' interest in proceeds when its debtor subsequently filed bankruptcy or the like. Subsections (1) through (3) were intended to cover the situation where the proceeds are segregated and identifiable. *Cf. Security Aluminum, supra,* 9 U.C.C.Rep.Serv. at 50; and *In re Trans–Texas Petroleum Corp.,* 33 B.R. 67, 69 (Bankr.N.D.Tex.1983). When such is the case, the secured creditor's interest in the proceeds is equivalent to the like interest of its counterpart in the non-insolvency scenario. *See Security Aluminum, supra,* 9 U.C.C.Rep.Serv. at 50–51.

When, however, the proceeds have been commingled with other like items, typically cash from other sources, subsection (4) creates a uniform tracing rule which permits the secured creditor to retain its security interest in only those proceeds received and commingled by the debtor in the ten days immediately prior to the institution of the insolvency proceeding. *See, e.g., Harley–Davidson Motor Co. v. Bank of New England–Old Colony, N.A.,* 85 B.R. 1, 5 (D.R.I. 1988), *aff'd in part & vacated in part on other grounds,* 897 F.2d 611 (1st Cir.1990); *First Nat'l Bank of Amarillo v. Martin,* 48 B.R. 317, 320 (N.D.Tex.1985); *Security Aluminum, supra,* 9 U.C.C.Rep.Serv. at 49–50; *In re Gibson,* 6 U.C.C.Rep.Serv. 1193, 1195, 1969 WL 11097 (Bankr.W.D.Okla.1969); *Howarth v. Universal C.I.T. Credit Corp.,* 203 F.Supp. 279, 283 (W.D.Pa.1962); and *In re Barsotti Bros. Bakery, Inc.,* 80 B.R. 745, 747

(Bankr.W.D.Pa.1987). If proceeds are commingled before the ten-day period, the secured creditor loses its security interest in such proceeds altogether. *Howarth,* 203 F.Supp. at 282–83. In this way, the insolvency courts, particularly the federal bankruptcy courts, do not need to determine and apply the often esoteric and varying tracing rules of the several states. *See Harley–Davidson, supra,* 85 B.R. at 5; *Martin, supra,* 48 B.R. at 320; *Security Aluminum, supra,* 9 U.C.C.Rep.Serv. at 51 & n. 4; *Barsotti, supra,* 80 B.R. at 747; and *Trans–Texas, supra,* 33 B.R. at 69. *See also* Official Comment to 1962 Official Text, at comment 2(a); and J. WHITE & R. SUMMERS, *supra,* § 52–10, at 463. In this regard, a secured creditor in the insolvency context may have different rights than its counterpart in a non-insolvency context, the latter being allowed to use applicable state law tracing rules in order to follow proceeds into a commingled account. *See Martin, supra,* 48 B.R. at 320 & n. 3.

In this case, three days of accounts receivable collections were diverted directly by the Debtor into the Meridian account. Thus, they were identifiable proceeds which were not commingled with any other funds. Counsel does not dispute this point, but argues that, because the proceeds were placed in a "deposit account prior to the insolvency proceeding," which, under § 9306(d)(2), is an exception to the perfection rules contained in §§ 9306(d)(2) and (d)(3), the Bank lost its priority. *Compare In re Allegheny Imaging Institute,* 69 B.R. 932, 936–37 (Bankr. W.D.Pa.1987). In so contending, Counsel apparently assumed that § 9306(d)(1) did not apply to the facts of the present case.

However, there is little doubt that a pre-petition security interest in proceeds does extend to proceeds which are not commingled, but are segregated from other funds, even if they are segregated in a "deposit account." *See, e.g., Howarth, supra,* 203 F.Supp. at 283; and *Trans–Texas, supra,* 33 B.R. at 69. Most authorities specifically cite to § 9306(d)(*1* ) as support for this conclusion. *See, e.g., Barsotti, supra,* 80 B.R. at 747;[2] and *Allegheny Imaging, supra,* 69

---

2. This case suggests that the segregated account must be "specifically created and used for the

B.R. at 936–37. *See also* T. QUINN, QUINN'S UNIFORM COMMERCIAL CODE COMMENTARY & LAW DIGEST, ¶ 9–306[A][6][a], [b] and [c], at 9–298 to 9–299 (2d ed. 1991). *Cf. Martin, supra,* 48 B.R. at 321.

These authorities assume that the term "non-cash," appearing in § 9306(d)(1), does not modify the second clause of the sentence, thus reading § 9306(d)(1) as extending secured creditors' respective liens to both any "identifiable non-cash proceeds" *and* any "separate deposit accounts containing only proceeds." *See Barsotti, supra,* 80 B.R. at 747; and *Allegheny Imaging, supra,* 69 B.R. at 937. This reading appears correct, because it would be impossible to deposit "non-cash proceeds" into a "deposit account."

Since the Bank has a valid security interest in the segregated accounts receivable which were placed in the Meridian account, and, in turn, in Counsel's escrow account containing the retainer, under § 9306(d)(1), there is no need to reach the issue of whether the Bank could have lost its security interest by reason of the deposit of the disputed funds into a "deposit account" pursuant to § 9306(d)(2). We do note that, in any event, several cases interpret the term "deposit account" in §§ 9306(d)(2) and (d)(3) as if it read "deposit account containing other sources of cash," *i.e.,* a commingled account. *See Gibson, supra,* 6 U.C.C.Rep.Serv. at 1195; *In re Triple A Coal Co., Inc.,* 55 B.R. 806, 811–12 (Bankr.S.D.Ohio 1985); *Salzer v. Victor Lynn Corp.,* 114 N.H. 29, 32, 315 A.2d 185, 186–87 (1974); and J. WHITE & R. SUMMERS, *supra,* § 25–10, at 463. There was no commingling of funds in the Meridian account, according to Caplan; all of the funds deposited were from the Debtor's pre-petition accounts receivable. These funds thus retained their status as segregated, secured funds upon their deposit into the escrow account. We also note that Counsel's contention that the Bank lost its lien in the retainer by reason of § 9306(d)(2) is undercut by the holding, in *In re O.P.M. Leasing Services, Inc.,* 46 B.R. 661, 670 n. 5 (Bankr.S.D.N.Y. 1985), that an "escrow account" is not a "deposit account."

We are therefore compelled to conclude that the Bank, at all pertinent times, retained a prior security interest in the funds held in Counsel's escrow account to support its "security retainer." The security interest which Counsel claims in the funds is therefore subordinate to the security interest of the Bank and precludes Counsel from obtaining payment of its final allowed compensation from this source. *Accord, D'Anna, supra,* 177 B.R. at 825.

Despite this conclusion, we are unwilling to order any turnover of funds to the Bank for the reasons stated at pages 67–68 *supra,* and in light of one further consideration. That is the observation that, in one respect, this result is unjust. Counsel was obliged, by the terms of 11 U.S.C. § 329 and F.R.B.P. 2016, to disclose its retainer agreement with the Debtor to all interested parties, including the Bank. It is reasonable to assume that, if the Bank had considered the Debtor's reorganizational prospects so bleak as to not justify any use of funds which constituted its security, it would have objected to the retainer agreement and a hearing would have been held on the issue of whether Counsel's "security retainer" was reasonable. It should therefore have come as no surprise to the Bank that, this court having approved Counsel's retention, one condition of which was the creation of this "security retainer," and having subsequently granted Counsel an interim fee application payable out of a considerable portion of that security retainer, we would continue to allow Counsel to look to that retainer as a source for payment for its fee applications. As we noted at page 68

---

deposit of proceeds" like a lockbox. 80 B.R. at 747. In other words, the *Barsotti* court suggests that if (1) a debtor opens a general deposit account to collect all manner of his receipts; (2) it first deposits proceeds into the account; and (3) it is forced to file bankruptcy before placing any further funds into the account, the secured creditor would lose its lien in the proceeds notwithstanding the fact that the proceeds are the only assets in a specific account merely because the account was not opened with the intention of holding just such funds. Assuming *arguendo* that there is support for this added condition somewhere in the UCC, the result here is not affected because the Meridian account was apparently opened specifically to hold proceeds and nothing else.

*supra*, we will, in our accompanying Order, give Counsel an opportunity to make a claim for the funds as properly securing the Bank's claim which its efforts reasonably preserve under 11 U.S.C. § 506(c). *But see In re Mall at One Associates, L.P.*, 185 B.R. 981, 987–93 (Bankr.E.D.Pa.1995) (present standards for § 506(c) allowances are restrictive).

We should also note that we are not moved by Counsel's argument that the Bank could have better protected itself by instituting a pre-petition lockbox or similar arrangement, or by contractually providing that all deposits of proceeds of the Debtor's accounts receivable must be made into the Debtor's account with it if it considered such an arrangement necessary. It appears that the Bank *did* take the precaution of requiring the Debtor to make deposit into the Bank's account in drafting the Extension Agreement, but that Caplan simply violated the terms of that Agreement by depositing proceeds into the Meridian account and subsequently improperly diverting the funds into Counsel's escrow account.

For all of these reasons, this court, in the proper exercise of its jurisdiction over Counsel's fee arrangement with the Debtor, concludes only that Counsel may not be paid the balance of its escrowed retainer in collecting payment for its final fee application as allowed in the total amount of $37,371.94.

*D. CONCLUSION*

An Order consistent with the conclusions reached in this Opinion will be entered.

*ORDER*

AND NOW, this 29th day of November, 1995, after a hearing of November 8, 1995, to consider the Objections ("the Objections") of Midlantic Bank, N.A. ("the Bank") to the Final Application ("the Application") of Fellheimer Eichen Braverman & Kaskey, the Debtor's counsel ("Counsel"), for compensation and reimbursement of expenses, it is hereby ORDERED AND DECREED as follows:

1. The Objections are SUSTAINED in part only.

2. Counsel is awarded final compensation, in addition to its prior interim fee award, of $31,128.50 for compensation for services and $6,243.44 as reimbursement for costs. All disallowances and the reductions of the hourly rates of attorneys Kaskey and Goodkind to $250/hour are noted directly on the original copy of the Application form.

3. Counsel may not, however, draw upon the balance of the escrow account containing the balance of its retainer of $95,393.22 to collect the fees and costs awarded herein, because this sum is subject to the Bank's prior security interest.

4. This case shall remain open to provide Counsel with an opportunity to file and serve any appropriate motion to recover fees from its escrow account, under 11 U.S.C. § 506(c), on or before December 11, 1995. If no such motion is filed, or if the issue is reported as resolved to the court, this case shall be closed.